**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JOHN COTTON,**

        **Plaintiff,**

v.                              **Civil Action 2:20-cv-5477
                                    Judge Michael H. Watson
                                    Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff, John Cotton, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability determination and **REMAND** this matter to the Commissioner and the ALJ pursuant to Sentence Four of § 405(g).

**I.**      **BACKGROUND**

Plaintiff protectively filed his application for DIB on March 7, 2017, alleging that he became disabled on January 1, 2017. (Tr. 12, 199–200). Plaintiff's application was denied initially on July 17, 2017, and denied on reconsideration on December 13, 2018. (Tr. 64–68, 79, 80, 81–100). An Administrative Law Judge (the "ALJ") subsequently held hearings on July 23, 2019, and on December 12, 2019. (Tr. 31–53, 54–63). On January 13, 2020, the ALJ issued a decision denying Plaintiff's DIB application. (Tr. 9–30). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on October 18, 2020 (Doc. 1), and the Commissioner filed the administrative record on April 21, 2021 (Doc.

16).  Plaintiff filed his Statement of Errors on June 7, 2021 (Doc. 16).  Defendant filed an Opposition on July 21, 2021. (Doc. 18).  Plaintiff has not filed a Reply.  Accordingly, the matter is ripe for review.

**A.     Relevant Hearing Testimony**

The ALJ summarized the testimony from Plaintiff's hearings:

> [D]uring the hearing, [Plaintiff] testified that he is unable to work because he cannot stand, due to fibromyalgia, neck pain and back problems [ ].  Further, [Plaintiff] testified that he cannot concentrate, as he experiences mental health symptoms, including depression, severe mood swings, and nervousness [ ].

(Tr. 18).

**B.     Relevant Medical Evidence**

The ALJ summarized Plaintiff's medical records and symptoms related to his physical impairments:

> The record documents diagnoses and treatment of fibromyalgia (Exs. 16F/1, 6 & 17F/7, 23), degenerative disc disease of the cervical and lumbar spine (Exs. 3F; 9F; 11F; 13F & 15F), degenerative joint disease of the right knee - status/post right knee surgery (Exs. 8F & 9F), obesity (See Exs. 2F; 3F; 7F; 15F & 18F), anxiety (Exs. 1F/12 & 5F), and depression (Exs. 1F/30; 5F & 12F). [ ].
>
> Since 2016, the record documents the [Plaintiff] sought treatment with complaints of chronic back pain (Ex. 2F/1, 11, 21, 30, 39, 49, 77). On September 12, 2016, his body mass index (BMI) was noted as 41.2 (Id. at 2). During 2016, his physical examination findings were normal, including a normal gait, except for findings of tenderness of the cervical and/or lumbar spine, decreased flexion, and decrease extension of the cervical and/or lumbar spine (Id. at 3, 13, 22, 31, 41, 50, 79, 95). In 2016, he was diagnosed with spondylosis of the lumbar region, cervicalgia, and other specified inflammatory spondylopathies of the cervical region (Id. at 4, 14, 22, 31, 41, 50, 80, 97). During 2017, the record documents the [Plaintiff]'s pain management treatments at Comprehensive Pain Specialists (Ex. 3F). During his physical examinations, he was noted to have a normal gait, and ambulated with no assistive devices (Exs. 2F/3, 13, 41, 79, 96; 3F/3, 7, 12, 16, 27, 35, 40; 9F/3; 15F & 18F/2, 6, 16, 24, 28).
>
> On January 9, 2017, he was noted to have restricted range of motion with pain exacerbations in all planes of the lumbar spine, positive facet loading bilaterally, an antalgic gait, and normal range of motion in the bilateral lower extremities (Ex.

2

3F/7). On January 24, 2017, he described his pain as aching, cramping, sharp, throbbing, and tingling; additionally, he reported that his pain was exacerbated by bending or stooping, changing from sitting to standing, and lifting or carrying heavy loads (Id. at 1). His BMI was noted as 39.88 (Id. at 2). During physical examinations, although noted to be painful, he was noted to have full range of motion of the cervical spine, his neurological findings were normal, and muscle strength, bulk, and tone were normal in the upper extremities (Ex. 3F/2-3, 7, 12, 16, 27, 40). Moreover, during 2016 and 2017, his diagnoses included spondylosis of the cervical spine and radiculopathy (Id. at 3, 7-8, 12, 16, 23, 27, 36, 40). Further, the record documents the [Plaintiff]'s emergency treatment on January 13, 2017, and he was diagnosed with nausea, vomiting, and diarrhea (Ex. 1F/1, 6). During a physical examination, normal findings were noted, except the [Plaintiff] had a hard time keeping his leg still; he was noted to have a normal mood and affect (Id. at 30).

[ ].  Moreover, an x-ray examination of the [Plaintiff]'s cervical spine, performed on, February 8, 2017, documented that no acute abnormalities or instability was observed (Ex. 4F/1). Additionally, an x-ray examination of his lumbar spine noted similar findings (Id. at 2).

The [Plaintiff] sought emergency care on September 3, 2017, with complaints of bilateral leg pain, which he reported had worsened during the prior week (Ex. 7F/9). Further, he reported that his pain was exacerbated by walking and lifting his legs up on the bed, and caused bilateral leg cramping (Id.). His BMI was noted as 43.4 and his physical examination noted normal findings (Id. at 11). He was diagnosed with muscle pain and claudication (Id. at 13).

On September 4, 2017, a lower extremity duplex exam failed to document any abnormal findings (Ex. 7F/8). Next, the record documents the [Plaintiff] sought emergency care on September 7, 2017, with complaints of chronic bilateral paresthesia; he reported that he had lost his health insurance, was not treating with his family physician, and that he was unable to afford pain management treatment (Ex. 7F/1). His BMI was noted as 45; a physical examination noted normal strength for flexion and extension of the bilateral lower extremities, negative straight leg raise testing results bilaterally, without midline cervical/thoracic/lumbar sacral tenderness to palpation (Id. at 3). He was diagnosed with acute paresthesia of the bilateral lower extremities (Id.).

While seeking treatment for a knee injury, on September 18, 2017, the [Plaintiff]'s gait was noted as slightly antalgic, and his neurological and psychiatric findings were normal (Ex. 8F/2). Further, on September 28, 2017, the [Plaintiff] underwent surgical procedures on his right knee, due to diagnoses of chondromalacia and synovitis (Id. at 4-5). A follow-up examination performed on October 9, 2017 noted improving range of motion of the right knee (Id. at 10). On the same date, the [Plaintiff] was treated for neck and low back pain that he described as aching, burning, cramping, dull, numb, sharp, stabbing, stinging, throbbing, and tingling

(Ex. 9F/1). He reported that his pain interfered with daily chores, employment, grooming, house chores, mood, sleep, and walking, but was alleviated by a hot shower; additionally, he reported that he was not taking narcotic pain medication at the time (Id.). A physical examination noted normal neurologic findings, painful but full range of motion of the cervical spine, normal muscle strength, bulk, and tone in the upper extremities, tenderness and myofascial trigger points in the trapezius muscles, and restricted range of motion of the lumbar spine, with pain exacerbations in all planes and positive facet loading bilaterally; however, he was noted to have normal range of motion and motor function in the bilateral lower extremities (Id. at 3). He was diagnosed with spondylosis of the cervical spine, cervical radiculopathy, other cervical disc displacement, and lumbar radicular pain (Id. at 4-5).

Moreover, the record documents the [Plaintiff] attended physical therapy sessions on September 29, 2017 and October 9, 2017 (Ex. 10F). On October 23, 2017, a nerve conduction study indicated findings consistent with bilateral sural sensory neuropathy and bilateral L5-S1 radiculopathy (Ex. 19F/1-2, 20). Further, the record documents the [Plaintiff] received pain management treatment for neck and back pain at Capital Pain Institute during 2016 through 2018; his BMI findings were assessed as being greater than 39 (Exs. 15F & 18F). He was diagnosed with spondylosis of lumbar region, osteoarthritis of the lumbar spine, lumbar radicular pain, cervical radiculopathy, cervical disc displacement, and myalgia; he was treated with lumbar facet injections, cervical facet joint injections, and cervical radiofrequency ablation (Exs. 15F/1, 6, 10, 13, 18, 23, 28, 32, 35, 40-41, 49 & 18F/3, 7, 10, 13, 17, 24, 29).

The record notes that a MRI of the [Plaintiff]'s cervical spine, performed on January 9, 2018, revealed a disc protrusion at C5-6, and that a MRI of his lumbar spine revealed this bulging and degeneration at L4-5 and L5-S1 (Exs. 11F/11 & 13F). These above-discussed objective findings support limiting the [Plaintiff] to performing work at the light level of exertion, consistent with the RFC stated above, as said findings fail to document a disc herniation or a need for surgical intervention.

Moreover, while the record notes the [Plaintiff] was diagnosed with fibromyalgia, the evidence fails to establish that this condition is disabling. The [Plaintiff] sought emergency treatment on July 31, 2018 was diagnosed with primary fibromyalgia syndrome and insomnia (Ex. 16F/1, 6). Additionally, during July of 2018 and March of 2019, the [Plaintiff]'s diagnoses included degenerative disc disease and fibromyalgia (Ex. 17F/7, 23). However, the record fails to document recurring complaints of diffuse pain that one typically sees with fibromyalgia.

The record documents the [Plaintiff] received lumbar epidural steroid injections on December 18, 2018, February 25, 2019, August 26, 2019, and October 1, 2019, and right sacroiliac joint injections on April 25, 2019, June 17, 2019, due to symptoms

of localized low back pain, which radiates to his hip and thigh regions consistent with sacroiliitis (Exs. 11F/1-2, 4, 7, 9 & 20F). [ ].

(Tr. 18–20).

The ALJ also summarized Plaintiff's medical records and symptoms related to his mental impairments:

> [ ]. On February 18, 2016, record documents the [Plaintiff] sought emergency care with complaints of depression and suicidal thoughts; he was diagnosed with recurrent major depression (Ex. 1F/29-35). From February 23, 2016 to February 26, 2016, the record documents he was hospitalized on a voluntary basis due to suicidal ideation; his diagnoses included bipolar disorder, generalized anxiety disorder, cannabis abuse, and chronic neck and low back pain (Ex. 1F/12-25).
>
> Next, the record documents that Marc E.W. Miller, Ph.D., a consultative psychological examiner, evaluated [Plaintiff] on June 20, 2017 (Ex. 5F). Dr. Miller diagnosed the [Plaintiff] with generalized anxiety disorder – severe and bipolar disorder II – moderate (Id. at 4). He opined that the [Plaintiff]'s symptoms indicate no significant difficulty in understanding, remembering, and carrying out one and two step job instructions; however, he opined that the [Plaintiff]'s symptoms indicate difficulty in interacting with coworkers, supervisors and the public, some difficulty in maintaining attention and concentration, and difficulty in dealing with stress and pressure in a work setting, due to his high level of anxiety (Id. at 4). Further, he opined that the [Plaintiff] is able to manage his own funds (Id.).
>
> In August of 2017, the record notes the [Plaintiff] was not being treated for bipolar disorder, and his rate of mood cycling was noted as moderate; he reported that his symptoms were exacerbated by emotional stress and family stressors, and relieved by medications (Ex. 6F/1). During the neuropsychiatric portion of a physical examination, the record notes that his self-perception was described as having no impairment (Id. at 2). He was diagnosed with bipolar disorder with severe depression (Id. at 3).
>
> Moreover, the record documents the [Plaintiff]'s mental health symptoms have been effectively managed with prescribed medications. On October 19, 2017 and December 19, 2017, the [Plaintiff]'s mood and affect were noted to be normal, euthymic, and mood congruent; he was diagnosed with bipolar disorder with severe depression (Ex. 12F/19, 21). The neuropsychiatric findings noted during his physical examinations were within normal limits, and his self-perception was described as having no impairment (Id.). However, the record notes that in late 2017 and early 2018, laboratory results noted that the [Plaintiff]'s prescribed medications, Xanax, Lyrica, and Amitriptyline were not detected at times (Ex. 14F/1, 4, 7).

5

> On March 20, 2018, he reported that he was feeling better, and stated that he was no longer seeing ghosts or people that he used to see (Ex. 14F/16). In June of 2018, his moods were noted as more stable (Ex. 12F/14). On December 12, 2018 and March 13, 2019, he reported that his moods had been fairly stable, he was sleeping well, and was coping fairly well with daily stressors (Ex. 12F/7, 9). In 2018 and early 2019, he was diagnosed with bipolar affective disorder and bipolar disorder with severe depression (Id. at 8, 10, 11, 14). In May and June of 2019, the [Plaintiff]'s mental health impairments were assessed and were found to be mild in severity (Ex. 12F/1, 5). A June 19, 2019 mental status examination noted that his mood as good, constricted, and euthymic, with no psychomotor retardation, hallucinations, or delusions; his memory was noted to be within normal limits, his insight was noted as good, and his judgment was noted as an adequate (Id. at 2). Moreover, he was noted to have no gait abnormalities (Id.). He was diagnosed with bipolar affective disorder and insomnia (Id. at 3, 6).

(Tr. 20–21).

**C.    The ALJ's Decision**

The ALJ found that Plaintiff meets the insured status requirement through June 30, 2022 and had not engaged in substantial gainful employment since his alleged onset date of January 1, 2017. (Tr. 14). The ALJ determined that Plaintiff has the following severe impairments: fibromyalgia, degenerative disc disease of the cervical and lumbar spine, degenerative joint disease of the right knee-status/post right knee surgery, obesity, anxiety, and depression. (*Id.*) The ALJ further determined, however, that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 15).

The ALJ then assessed Plaintiff's residual functional capacity ("RFC"):

> After careful consideration of the entire record, [the ALJ] finds that that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the [Plaintiff] could occasionally climb ramps and stairs; he should avoid climbing ladders, ropes, and scaffolds; he could occasionally stoop; he could frequently kneel and crouch; he could occasionally crawl; he could frequently reach overhead with the bilateral upper extremities; he should avoid exposure to hazards, including moving machinery and working at unprotected heights; he could tolerate occasional exposure to fumes, dust, gases, and extreme cold; he could understand, remember, and carry out simple routine tasks; he could respond appropriately to coworkers and supervisors in a goal oriented work setting; he should avoid interactions with the public; and he could occasionally interact with coworkers.

6

(Tr. 17).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence and other evidence in the record for the reasons explained in this decision." (Tr. 18). Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff was unable to perform his past relevant work as a dry wall applicator or an optical technician but could perform jobs that exist in significant numbers in the national economy, such as a routing clerk, labeler, or production line solderer. (Tr. 23–24). The ALJ therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from January 1, 2017, through the date of this decision (20 CFR 404.1520(g))." (Tr. 25).

## II.  STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence,

7

it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

Plaintiff alleges that the ALJ erred by failing to find that his radiculopathy was a medically determinable impairment at step two of the disability determination process. (Doc. 16 at 10–13). In addition, Plaintiff alleges that the ALJ's RFC determination is not supported by substantial evidence because the ALJ found that he could perform light work even though his standing and/or walking limitations preclude work at that exertional level. (*Id*. at 6–8). Plaintiff also alleges that the ALJ's RFC lacks substantial support because the ALJ erred when analyzing medical opinion evidence. (*Id*. at 8–10).

### A. The ALJ's Step Two Analysis

Plaintiff alleges that the ALJ erred at step two because he failed to find that Plaintiff's radiculopathy was a medically determinable impairment. The Undersigned finds that this allegation lacks merit.

An ALJ must make several determinations at step two. First, an ALJ must consider if a claimant's impairment constitutes a "medically determinable" impairment, i.e., an impairment that results from anatomical, physiological or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1520; 404.1521. If an impairment is medically determinable, then an ALJ must determine whether it is severe. *Id.* A "severe impairment" is defined as "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

The finding of at least one severe impairment at step two is merely a threshold inquiry, the satisfaction of which prompts a full investigation into the limitations and restrictions imposed by all the individual's impairments. *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007). "And when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two '[does] not constitute reversible error.'" *Id.* (quoting *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *accord Smith v. Comm'r of Soc. Sec.*, No. 2:20-cv-1511, 2021 WL 972444, at *10 (S.D. Ohio Mar. 16, 2021) (finding no error despite ALJ's failure to designate plaintiff's neuropathy as a medically determinable or severe impairment where the ALJ discussed plaintiff's neuropathy and considered its impact on plaintiff's ability to work).

Plaintiff argues that the failure to classify an impairment as medically determinable should be subject to a different standard of review than the failure to classify an error as severe. (Doc. 16 at 12) ("This error is different than the ALJ merely mischaracterizing a severe impairment, as a non-severe impairment, because, in such a situation, the non-severe impairment would still receive consideration throughout the evaluation process."). True, when "an alleged impairment is not medically determinable, an ALJ need not consider that impairment in assessing the RFC." *Jones v. Comm'r of Soc. Sec.*, No. 3:15-cv-00428, 2017 WL 540923, at *6 (S.D. Ohio Feb. 10, 2017). But when the ALJ does consider the evidence supporting the impairment when crafting the RFC, as the ALJ did here, the harmless-error analysis should be the same. In other words, Plaintiff's argument "raises a distinction without a difference . . . ." *Fresquez v. Comm'r of Soc. Sec.*, No. 1:18cv114, 2019 WL 1440344 at *1 (S.D. Ohio Mar. 31, 2019) (declining to apply a different harmless-error analysis when the ALJ did not list plaintiff's chronic fatigue syndrome as a medically determinable impairment at step two yet considered it nonetheless in the RFC).

Here the ALJ determined that Plaintiff had the following medically determinable impairments that were severe: fibromyalgia, degenerative disc disease of the cervical and lumbar spine, degenerative joint disease of the right knee-status/post right knee surgery, obesity, anxiety, and depression. (Tr. 14). The ALJ did not, however, explicitly find that Plaintiff's radiculopathy was medically determinable. Defendant urges that any error was harmless. The Undersigned agrees.

Plaintiff does not point to, and it is not apparent from the record that there are any functional limitations attributable to his radiculopathy that the ALJ failed to consider. *See id.*; *see also Rouse v. Comm'r of Soc. Sec.*, No. 2:16–cv–223, 2017 WL 1102684, at *2 (S.D. Ohio March 24, 2017) ("Despite it being better practice [for an] ALJ to say explicitly which impairments are found to be non-severe and which are found to not be medically determinable . . ." the plaintiff "failed to identify which impairments at issue [had] affected her functioning or limited her ability to work, nor [was] it apparent from the record."). The only physical limitations in this case were the ones that were opined by the state agency reviewing physicians, and the ALJ incorporated all of them into Plaintiff's RFC. (Tr. 93–95, 72–74, 17). Moreover, Plaintiff has not challenged the ALJ's adverse credibility determination (aka the ALJ's subjective symptom analysis). *Fresquez*, 2019 WL 1440344, at *1. For these reasons, the Undersigned finds that this allegation of error lacks merit.

**B.      The ALJ's RFC Determination**

As noted, Plaintiff alleges that the ALJ's RFC determination lacked substantial support. A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from [his] impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the

10

final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). In doing so, the ALJ is charged with evaluating several factors when determining the RFC, including the medical evidence (not limited to medical opinion testimony) and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

    *1. The ALJ's Determination that Plaintiff Was Capable of Light Work*

Plaintiff first asserts that the ALJ's RFC determination was not supported by substantial evidence because the ALJ erred when assessing Plaintiff's walking and standing limitations. The Undersigned finds that this allegation of error lacks merit.

After considering Plaintiff's physical impairments and limitations, the ALJ determined that Plaintiff was capable of light work, as defined in 20 C.F.R. § 404.1567, with additional postural, manipulative, and environmental restrictions. (Tr. 17). Plaintiff correctly notes that a full range of light work requires standing or walking, off and on, for a total of approximately six hours in an eight-hour workday. SSR 83-10, 1983 WL 31251 (Jan. 1, 1983). Plaintiff further urges that he was unable to walk or stand for six to eight hours because the record evidence, including his hearing testimony, reflects that he had "difficulties with walking" and that he was "prevented from standing for more than 10 minutes" or "walking more than ten to fifteen steps, at a time." (Doc. 16 at 7–8).

The ALJ's determination that Plaintiff was capable of walking and/or standing for six hours

11

out of an eight-hour workday is supported by substantial evidence. Although one examination after the alleged date of onset found that Plaintiff had a "slightly antalgic gait" (Tr. 520), other examinations after the alleged date of onset routinely found that Plaintiff "ambulate[d] with normal gait pattern with no assistive device" (Tr. 454, 441, 532, 614, 610, 600, 605, 592, 588). Examinations of Plaintiff's bilateral lower extremities after the alleged date of onset also routinely found that Plaintiff had normal range of motion and 5/5 motor function all around. (Tr. 532, 610, 600, 605, 592, 588). Other examinations after the alleged date of onset noted +5/5 strength and intact sensation in Plaintiff's bilateral lower extremities (Tr. 295); 5/5 motor strength bilaterally throughout (Tr. 441); and that Plaintiff moved all extremities with equal coordination and strength (Tr. 639–40). After seeking treatment for pain radiating from his low back into his lower extremities, Plaintiff also reported in 2019 that he had responded favorably to lumbar epidural steroid injections. (Tr. 761, 760, 759). In addition, the state agency reviewing physicians at the initial and reconsideration levels both opined that Plaintiff was capable of standing and/or walking six hours in an eight-hour workday. (Tr. 72, 94).

For these reasons, the Undersigned finds that the ALJ did not commit reversible error when assessing Plaintiff's standing and/or walking limitations. Plaintiff's allegation of error lacks merit.

2. *The ALJ's Assessment of Opinion Evidence About His Mental Health Impairments*

Plaintiff additionally asserts that the ALJ's RFC determination was not supported by substantial evidence because the ALJ erred when assessing medical opinions about his mental limitations. Specifically, Plaintiff alleges that the ALJ erred when weighing opinion evidence from consultative examiner Dr. Miller and the state agency reviewing psychologists. The Undersigned finds that these allegations of error have merit.

12

The regulations that govern Plaintiff's application "[define] three types of medical sources: non-examining sources, non-treating (but examining) sources, and treating sources." *Pollock v. Comm'r of Soc. Sec.*, No. 2:20-CV-1853, 2021 WL 940286, at *6 (S.D. Ohio Mar. 12, 2021) (quoting *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 273 (6th Cir. 2015) (citing 20 C.F.R. § 404.1502)). When opinions come from a non-treating but examining source, like Dr. Miller, or from non-examining sources, like the state agency reviewing psychologists, they are usually not entitled to controlling weight. *See id*. (citing 20 C.F.R. § 404.1527(c)(2)). Instead, an ALJ should consider relevant factors, including supportability, consistency, and specialization. *Id*. "There is however, no 'reasons-giving requirement' for non-treating source opinions." *Id*. (quoting *Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016)). "Rather, the ALJ must provide only 'a meaningful explanation regarding the weight given to particular medical source opinions.'" *Id*. (quoting *Mason v. Comm'r of Soc. Sec.*, No. 1:18 CV 1737, 2019 WL 4305764, at *7 (N.D. Ohio Sept. 11, 2019) (citing SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996))).

In this case, the ALJ summarized Dr. Miller's opinion as follows:

> As for the opinion evidence, the undersigned considered the opinion of Marc E.W. Mille, Ph.D., a consultative psychological examiner, who evaluated claimant on June 20, 2017 (Ex. 5F). Dr. Miller diagnosed the claimant with generalized anxiety disorder – severe and bipolar disorder II – moderate (Id. at 4). He opined that the claimant's symptoms indicate no significant difficulty in understanding, remembering, and carrying out one and two step job instructions; however, he opined that the claimant's symptoms indicate difficulty in interacting with coworkers, supervisors and the public, some difficulty in maintaining attention and concentration, and difficulty in dealing with stress and pressure in a work setting, due to his high level of anxiety (Id. at 4). Further, he opined that the claimant is able to manage his own funds (Id.).

(Tr. 22). The ALJ then wrote an incomplete sentence explaining how he weighed Dr. Miller's opinion. The ALJ wrote: "Accordingly, the undersigned assigns some weight to the consultative

13

examiner's opinion, as the record " (*Id.*) (*sic*). In short, it appears that the ALJ forgot to include an explanation, meaningful or otherwise, regarding the weight he assigned to Dr. Miller's opinion.

The ALJ's failure to provide any explanation as to why he assigned some weight to Dr. Miller's opinion is compounded by his error when assessing the state agency reviewing psychologists' opinions. The ALJ first noted some of their opinions:

> Additionally, the undersigned considered the opinions of the State agency psychological consultants, who opined that the claimant has moderate limitations in the areas of sustained concentration and persistence, social interaction, and adaption (Ex. 1A), and moderate limitations in the areas of sustained concentration and persistence, with a marked limitation in social interaction (Ex. 4A).

(Tr. 22). The ALJ then explained the weight assigned that he assigned to those opinions. He wrote: "Accordingly, the undersigned assigns some weight to the psychological consultants' opinions because the opined social interaction and adaption limitations are not stated in vocationally relevant terms." (*Id.*)

The Undersigned finds that this determination is not supported by substantial evidence. At both the initial and reconsideration level, the state agency reviewing psychologists found that Plaintiff's social interaction limitations limited him to work that required no more than brief and superficial contact with others. (Tr. 75, 97). When assessing Plaintiff's RFC, however, the ALJ changed that social interaction limitation from "superficial contact" to "occasionally interact[ing] with coworkers." (Tr. 17). That was error. Courts in the Sixth Circuit have explicitly recognized that superficial interactions and occasional interactions are not coextensive. Those courts have explained that "'[o]ccasional contact' goes to the quantity of time spent with [] individuals, whereas 'superficial contact' goes to the quality of the interactions." *Lindsey v. Comm'r of Soc. Sec.*, No. 2:18-cv-18, 2018 WL 6257432, at *4 (S.D. Ohio Nov. 30, 2018) (quoting *Hurley v. Berryhill*, No. 1:17-CV-421-TLS, 2018 WL 4214523, at *4 (N.D. Ind. Sept. 5, 2018)), *report and recommendation adopted*, 2019 WL 133177 (S.D. Ohio Jan. 8, 2019); *Fenton v. Comm'r of Soc.*

14

*Sec.*, No. 1:20-CV-413, 2021 WL 3721212, at *3 (S.D. Ohio Aug. 23, 2021) (explaining that superficial and occasional are not interchangeable), *report and recommendation adopted*, No. 1:20-CV-413, 2021 WL 4077990 (S.D. Ohio Sept. 8, 2021); *Redd v. Comm'r of Soc. Sec.*, No. 1:20-cv-222, 2021 WL 1960763, at *4 (W.D. Mich. May 17, 2021) ("With regard to social limitations, courts have distinguished limitations that concern "the quality or nature of interactions" from limitations that concern "the quantity of time involved with those interactions.")

Because superficial and occasional are not coextensive, courts in this Circuit routinely find that an ALJ may not replace a social functioning limitation regarding superficial interactions with one regarding occasional interactions, absent adequate explanation. *See e.g.*, *Runyon v. Comm'r of Soc. Sec.*, No. 2:20-CV-3820, 2021 WL 3087639, at *4 (S.D. Ohio July 22, 2021) (remanding where ALJ gave "some" weight to opinion that plaintiff was limited to superficial interactions but erroneously attempted to incorporate that opinion into the RFC by limiting plaintiff to occasional interaction without explaining the substitution) *report and recommendation adopted*, No. 2:20-CV-3820, 2021 WL 3489615 (S.D. Ohio Aug. 9, 2021); *Hutton v. Commissioner of Social Security*, No. 2:20-cv-339, 2020 WL 3866855, at *4 (S.D. Ohio July 9, 2020) (remanding where ALJ gave "some" weight to opinion that plaintiff was limited to superficial interactions but erroneously attempted to incorporate that opinion into the RFC by limiting plaintiff to occasional interactions because superficial was purportedly "'not well defined and vocationally [relevant]'"), *report and recommendation adopted*, 2020 WL 4334920 (S.D. Ohio July 28, 2020); *Clampit v. Comm'r of Soc. Sec.*, No. 3:20-CV-1014, 2021 WL 3174111, at *2 (N.D. Ohio July 26, 2021) (explaining that although the ALJ was not required to adopt an opined superficial interaction limitation, he could not fail to explain why he declined to do so).

15

In this case, the ALJ substituted an occasional interaction limitation for the state agency reviewers' opinion that Plaintiff was limited to superficial contact and indicated that he did so because the opined social interaction limitations of the state agency reviewers "were not stated in vocationally relevant terms." (Tr. 17). That explanation does not suffice because "'superficial interaction' is a well-recognized, work-related limitation." *Hutton*, 2020 WL 3866855, at *5.

To be clear, an ALJ is not required to recite medical opinions verbatim. *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). And certainly, where, as here, an ALJ has accorded an opinion only "some weight," the ALJ need not include all opined limitations in an RFC. Nevertheless, the ALJ's discussion reveals that he failed to consider whether Plaintiff required a superficial interaction limitation given that he erroneously indicated that such a limitation was not "vocationally relevant" and believed that it was coextensive with an occasional interaction limitation.

Moreover, an ALJ must provide an explanation that allows this Court to conduct a meaningful review of the decision. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (noting that an ALJ's decision "must include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.'" (quoting 5 U.S.C. § 557(c)(3)(A))). In this case, the ALJ failed to provide any explanation for the weight he assigned Dr. Miller's opinion and provided an inadequate explanation for the weight he assigned to the state agency reviewers' opinions. For that reason, the Undersigned finds that Plaintiff's allegation of error has merit, and the ALJ's RFC finding was not supported by substantial evidence.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the

Commissioner's non-disability determination and **REMAND** this matter to the Commissioner and the ALJ pursuant to Sentence Four of § 405(g).

V.  **PROCEDURE ON OBJECTIONS**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: November 24, 2021 /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE